arise, rendering other delays necessary, till he should come again two years afterward, and these delays are liable to be repeated till the proceedings would become practically interminable. This would be equivalent to a total denial of justice. The estate in question amounts to several hundred thousand dollars, and numerous parties are interested in its speedy settlement. The parties interested are, at least, entitled to have an early adjudication of their rights. They may, or may not, be entitled to a dividend upon their claims before the termination of the objector's suit. However that may be, they are certainly entitled to have the appropriate tribunals determine whether they are so entitled or not, or what their rights are; and for a judge to refuse to hear their case simply on a point of delicacy, because he happens to find himself in an embarrassing position, though not legally disqualified, and when there is practically no other judge who can sit, would, in my judgment, be a gross injustice. Chancellors Kent and Walworth both sat in cases when they were disqualified by the express terms of the statute. Ex parte Leefe, 2 Barb. Ch. 39; People v. Edwards, 15 Barb. 529. In the latter case, Judge Strong decided the case, although interested in the question, but not in the case. An interest in the questions to be litigated does not appear to have been regarded as disqualifying the judge, provided he is not interested in the case. In Stuart v. Mechanics' & Farmers' Bank [19 Johns. 496], Chancellor Kent was a stockholder in the bank. In Mooers v. White, 6 Johns. Ch. 360, he was also disqualified. Chancellor Kent sat in these cases after consulting Chief Justice Spencer, and with his approval. This action was put on the ground that there was no other judge who could sit, and there would otherwise be a failure of justice. Pearce v. Atwood, 13 Mass. 340, Com. v. Ryan, 5 Mass. 90, and Hill v. Wells, 6 Pick. 109, and other cases, recognize the propriety of the course in such cases. The judges of the state district courts in San Francisco have, during the past twenty odd years, tried numerous cases in which the city was a party, involving in the aggregate millions of dollars, and in which the judges, as taxpayers and property holders, were necessarily interested. So, also, have the supreme court judges, although citizens of San Francisco, finally adjudicated such cases on appeal, and many others in which the state was a party, and in which they must necessarily have been interested as citizens, liable through taxation to respond. But in this case it is not necessary to go so far, as I am no longer in any manner interested either in the case or any of the questions involved, or otherwise legally disqualified. I must decline to act, if at all, on a mere matter of delicacy, because, under the circumstances, I find it unpleasant to do so. The bankrupt act manifestly gives the circuit court supervisory jurisdiction over all matters during the course of the proceedings, embracing every interlocutory order, in order that the rights of parties may be summarily adjudicated. A refusal to act by the only judge whose action can be invoked for a period of two years, when another judge will be present for a short time only, would utterly thwart the wise policy of the law.

After mature consideration, I am fully satisfied that I am not legally disqualified to act in the case, and further, that being qualified, I am not at liberty upon a matter of mere personal feeling or preference to decline the responsibility thrown upon me by my official position; nor, in my judgment, would I have been justified, under the circumstances, in declining to permit the disqualification to be removed, by refusing to sell my claim for the purpose of avoiding that responsibility. Notwithstanding the fact that my own mind had reached the conclusions announced, I was still unwilling to trust wholly to my own judgment in a matter of some delicacy. I have, therefore, consulted two of the United States district judges of this circuit, and all of the present justices of the supreme court of the state upon the point, and I am permitted to say that, without exception, they fully concur in the view that I am not disqualified, and being qualified, that I cannot decline to act under the circumstances without a gross and inexcusable violation of my official obligations. If I had entertained a doubt upon the point, I should still feel constrained to yield to the unbiased and disinterested judgment of jurists so eminently qualified to advise in a matter of the kind, especially as their judgment is in favor of my assuming jurisdiction in a matter wherein (if I could do so consistently with my own convictions of duty), I would gladly avoid action. The objection to the jurisdiction on the ground of disqualification of the judge is overruled.

---

## Case No. 12,861.

### In re SIME et al.

[3 Sawy. 305;[1] 12 N. B. R. 315.]

District Court, D. California. March 23, 1875.[2]

BANKRUPTCY — NEGOTIABLE PAPER — PURCHASER FOR VALUE.

1. After the bankruptcy of the maker his certificates of deposit are dishonored paper, and after they have been proved as claims against his estate no longer possess the qualities of negotiable paper.

2. Such claims are not entitled to the protection allowed by law to negotiable instruments, but stand on the same footing as a claim proved for an open account.

3. A person who takes an assignment of a claim proved in bankruptcy, as security for an antecedent liability from him in whose name the claim is proved, and who is apparently, though not really, the owner thereof, is not a purchaser for value and cannot hold the claim against the true owner.

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

[2] [Affirmed by circuit court in Case No. 12,-860.]

Petition of Sol. A. Sharp for an order restraining the trustee, P. J. White, from paying certain moneys in his hands to one Wm. T. Garratt, and directing the payment of said moneys to the petitioner. The material facts are as follows: John Sime & Co. were bankers, and on the first day of November, 1871, filed a petition and were adjudged bankrupts. At the time of the failure, Wm. R. Briggs was the holder of two certificates of deposit issued to him by Sime & Co. of the usual form payable to himself or his order on return of the certificate properly indorsed, one for $4,000 and the other for $3,500. At the same time the petitioner, Sharp, had a balance on an open deposit account to his credit of $1,413.92. Prior to the said first of November, two suits had been commenced and were still pending, one against John N. Risdon, and the other against Risdon & Coffee, the plaintiff in each being one Smith, who sued as assignee of John Sime & Co. and for their use and benefit. In these suits the property of John N. Risdon had been attached and released upon an undertaking executed by William Ware and the respondent Garratt. Garratt had also paid out for Risdon $3,200 on a note. Before executing the undertaking Garratt obtained from Risdon a conveyance of certain real property on Bush street as security for the money paid, and against his liability on the undertaking.

In this state of affairs, an agreement was made between Briggs, Sharp and Risdon on the same day (November 1), whereby it was agreed between them that Sharp and Briggs should assign their claims against Sime & Co. to Risdon; that Risdon should execute notes for sixty per cent of their amount, the notes to be indorsed by Ware; that the certificates of Briggs, and the account of Sharp, when indorsed and assigned, should be placed in the hands of R. H. Lloyd, and the notes in the hands of John R. Jarboe; and that in the event Risdon was able to use these claims as a setoff in the before-mentioned suits, then Lloyd was to deliver the certificates and account to Risdon, and Jarboe the notes to Briggs and Sharp. If the claims were not used as a setoff, then the notes were to be given up by Jarboe to Risdon, and the claims to Briggs and Sharp, by Lloyd. At the time of making the agreement it was supposed that Sime & Co. would go into bankruptcy, and it was uncertain whether the claims would be assigned before the filing of their petition so that they could be used as setoffs. In pursuance of this agreement Sharp made a written assignment of his account to Risdon, and Briggs indorsed his certificates; the notes were executed and placed in the hands of Jarboe and the claims in the hands of Lloyd. Briggs' indorsement was as follows: "Without recourse. W. R. Briggs." The assignments from Briggs and Sharp to Risdon were made after the petition was filed. On the ninth of December, 1871, Lloyd made out formal proofs of these claims in his hands, which were sworn to by Risdon. They were then left in the hands of register Bates, Mr. Lloyd stating to the register, that he was acting for other parties in the matter, and claimed a right to control the claims. Subsequently the claims got into the hands of the trustee White, and on the twelfth of September, 1872, into those of register Clarke. Prior to this no file mark appears on the claims. Attached to the proof is a copy of Sharp's account with the written assignment and the original certificates of Briggs indorsed in blank as aforesaid. So that on their face the claims appeared to be Risdon's. On each proof over the date of October 21, 1872, is a statement signed by the trustees to the effect that the claim is allowed, but that they think the assignment was made after the petition was filed, and that the claims cannot be used by Risdon as a setoff. On November 21, 1872, Risdon, by an assignment filed with register Clarke, assigned both claims to the respondent, Wm. T. Garratt, as security, in addition to the real property before conveyed, for the liability on the undertaking and the money paid as aforesaid. No new or present consideration was paid by Garratt for the assignment. When the agreement was made it was supposed the Sime & Co.'s estate would pay about twenty-five cents on the dollar. Afterwards by an advance in stocks the estate became able to pay dollar for dollar. The suits against Risdon went to judgment without the claims being used as setoffs; ever since the trustee and his attorney have refused their assent to the allowance of them as a setoff in the bankruptcy matter. Before the filing of the present petition Briggs assigned his interest in the claims to the petitioner, Sharp.

Sharp & Lloyd and Walter H. Tompkins, for petitioner.

M. M. Estee, for respondent.

HILLYER, District Judge. Upon the facts it is plain that Risdon never has become, and he never can become, the true owner of these claims, under the agreement between him and Sharp and Briggs. Because he never did, and he never can, use them as a setoff to the demand of Sime & Co. against him. The construction sought to be put upon the agreement by counsel for Garratt, that it was the intention of the parties to transfer the absolute title to Risdon subject only to a right on his part to return the claims and receive the notes, if he could not use them as a setoff, is not the true one. This is evident from the fact that Sharp and Briggs, by the terms of the agreement never could become entitled to a delivery of the notes to them until the claims were used as setoffs. The agreement must all be construed together; and so taken, the use of the claims as a setoff was the thing upon which the right of Risdon to the claims, and of Sharp and Briggs to the notes, hinged.

So far, then, as the parties to the agreement are concerned the property in these claims never was in Risdon. His assignment of them, under the circumstances, was a fraudulent act, and the only question in this case upon which I have felt any hesitation is, whether Garratt got them under such circumstances as to debar the true owners from asserting their title against him.

But little need be said in answer to that portion of respondent's argument which went upon the assumption that the two certificates of deposit were negotiable instruments, and came into Garratt's hands as indorsee without notice of any of the facts impeaching Risdon's title. For, after the bankruptcy of the maker, they were dishonored paper, and, after they were proved and filed as claims in the bankruptcy court, they no longer had the qualities of negotiable paper. The claims, as such, were neither transferable by delivery nor indorsement; they could still be assigned but not delivered or taken from the files. It is surely a complete misnomer to call such claims negotiable paper. The claim, then, which embraces the certificates, stands on the same footing as the one proved for the open account. These claims must be treated as personal property, and as not entitled to the immunities and protection allowed by law to negotiable instruments.

The general rule of the common law is, that no one can give a better title to personal property than he has himself. Murray v. Lardner, 2 Wall. [69 U. S.] 110. It is said in Root v. French, 13 Wend. 570, that one exception to this rule which will give a third person a better title and a superior equity to the true owner, is made in favor of a third person who has given value for the property or incurred some responsibility upon the credit of it, and without notice of the fraud.

Garratt claims that he is a purchaser for value without notice of the fraud. Is he? It has been held that "a person who takes a bill which upon the face of it was dishonored, cannot be allowed to claim the privileges which belong to a bona fide holder without notice. If he chooses to receive it under such circumstances, he takes it with all the infirmities belonging to it; and is in no better condition than the person from whom he received it." Andrews v. Pond, 13 Pet. [38 U. S.] 65. And again: "A note overdue or a bill dishonored is a circumstance of suspicion to put those dealing for it afterwards on their guard, and in whose hands it is open to the same defenses that it was in the hands of the holder when it fell due. After maturity such paper cannot be negotiable in the due course of trade, although still assignable." Fowler v. Brantley, 14 Pet. [39 U. S.] 318. If this is true of notes and bills which pass by delivery, a fortiori it must be so of claims, like those in the present case, assigned after the bankruptcy of the maker and actually proved up and filed in the bank-

ruptcy proceedings. Nor can the fact that the claims were proved up in the name of Risdon be regarded as any higher evidence of title in him than would his possession of the assigned account and the indorsed certificates had the claims not been proved and filed.

If it is prima facie evidence of title it is not conclusive against the true owner. Possession, says the supreme court of California, of personal property is only prima facie evidence of ownership, and never prevails against the true owner, except with reference to negotiable instruments and whatever comes under the general denomination of currency. The principle that no one can be divested of his property without his consent, and the maxim that no one can transfer a better title than he has himself, control all questions arising as to property, of which a transfer is attempted, with the exception stated. Wright v. Solomon, 19 Cal. 64. Wetmore v. San Francisco, 44 Cal. 294, cited by respondents, is not against this, because there the assignor of the demand against the city was the true owner of it, and assigned it absolutely. Here, Risdon was not the owner, and, under the general rule, could convey no better title than he had.

But is Garratt a purchaser for value? Whether in the case of the transfer of a negotiable instrument as security for a pre-existing debt, the transferee is a holder for value so as to cut off equities between the antecedent parties, is a very unsettled question. The tendency of the supreme court of the United States seems to be towards holding that the transferee under such circumstances takes the paper clear of equities of which he had no notice. Swift v. Tyson, 16 Pet. [41 U. S.] 1; and Goodman v. Simonds, 20 How. [61 U. S.] 343. But this, if ever it is done, will be on account of the favor with which the commercial law regards negotiable paper from a desire to make its circulation as safe and untrammelled as possible. The same reason, however, does not apply to this case, and unless the respondent gave value, incurred some responsibility, parted with something, on the credit of the assignment, he can have no equity superior or equal to that of the true owners.

But Garratt has parted with nothing on the faith or credit of Risdon's assignment, and will be in no respect worse off, if these claims are returned to the true owner, than he was before they were assigned to him. The assignment of the claims to Garratt as a security for pre-existing debts and liabilities does not constitute him a "purchaser for value" according to the legal import of that term, nor enable him to invoke the rule, that where one of two innocent parties must suffer, from the fraud of a third person, he shall suffer who by some act of his has put it in the power of the third person to commit the fraud. On the other hand, these claims represent so much coin deposited by

Sharp and Briggs with Sime & Co., and hitherto they have received nothing for them. The notes in Jarboe's hands are not, and as we have seen, they cannot, under the agreement, become available to them. So that, if the respondent were to succeed, he would get some $10,000, for which he had actually given nothing. Or Risdon himself would get it in case this additional security was not needed to make Garratt whole on the liabilities he has incurred for Risdon. Such a result is repugnant alike to law and equity. In addition to this, the testimony of Garratt leaves little doubt in my mind that he took the assignment with full knowledge of the true state of Risdon's title. I rest the decision, however, upon the ground that Garratt is not a purchaser for value, and cannot, therefore, hold these claims against the true owner, whom I find to be the petitioner.

There must be a decree for the petitioner as prayed, with costs.

On appeal, Sawyer, Circuit Judge, affirmed the decree of the district court. [Case No. 12,-860.]

SIMM (EMERSON v.). See Case No. 4,443.
SIMM (KING v.). See Case No. 7,805.
SIMMES (McGUNNIGLE v.). See Case No. 8,817.

## Case No. 12,862.
SIMMES v. MARINE INS. CO.
[2 Cranch, C. C. 618.] [1]
Circuit Court, District of Columbia. Nov. Term, 1825.

MARINE INSURANCE — INSURABLE INTEREST — FREIGHT—BILL OF LADING—DESTINA-. TION OF VESSEL.

1. A person, for whose use a vessel worth $3,000 or $4,000 was built, and who held the builders' bond of conveyance of the same, upon the payment of $1,260, and who had the entire possession and use of the vessel, had an insurable interest in the freight, and truly represented himself to the underwriters as the owner of the vessel, although the register was in the name of the builder, and that fact not disclosed to the underwriters at the time of executing the policy.

2. Upon an open policy from St. Thomas to Havana, it was not necessary to disclose the fact that the vessel had sailed from Alexandria to Buenos Ayres, where a part of the cargo was discharged, and thence to St. Thomas.

3. The owner of a vessel is entitled to reasonable freight only, unless he shows an express contract for a specific sum, or price.

4. The bill of lading was not conclusive evidence of such a contract.

5. The bond of conveyance of the vessel, by the builder, to the plaintiff, was not conclusive evidence that the ownership, so far as the freight was concerned, was in the builder at the time of the insurance.

6. It was no valid objection to the plaintiff's recovering freight from the Danish island, St. Thomas, to the Spanish colony, Havana, that the vessel had been chartered at Buenos Ayres,

[1] [Reported by Hon. William Cranch, Chief Judge.]

then in a state of revolt against Spain, by Danish subjects, resident at St. Thomas, for a voyage from Buenos Ayres to Havana, with leave to stop at St. Thomas, where she did stop and changed her papers, and took a new bill of lading without unlading the cargo.

This was an action [by Alexander Simmes against the Marine Insurance Company of Alexandria] upon an open policy on freight of the schooner Eleanor Simmes, from St. Thomas to Havana, amounting to $3,100. The vessel was lost near Havana.

The facts of the case appeared to be, that the vessel was built by one Levin Stewart, for the plaintiff, who was master of the vessel, and who had her rigged at his expense. That she was delivered to the plaintiff by Stewart, who registered her in his own name, and gave the plaintiff a bond to convey her to him upon the payment of the balance due for the building of her, amounting to $1,260. The value of the vessel being between $3,000 and $4,000. The application for insurance called her the Eleanor Simmes, Alexander Simmes, master and owner.

Hewitt & Key, for plaintiff.
Taylor & Swann, for defendants.

Mr. Swann, for defendants, moved the court to instruct the jury, that the plaintiff had shown no insurable interest in the freight; but that if he had, the nature of his interest ought to have been disclosed. He contended that freight cannot be insured as freight by any person who is not the owner of the vessel, unless the nature of the plaintiff's claim for freight be disclosed to the underwriters at the time of executing the policy. That the plaintiff had no insurable interest in the freight, until he had paid the $1,260. Riley v. Delafield, 7 Johns. 522; Camden v. Anderson, Marsh. Ins. (Portland Ed.) 91.

Mr. Taylor, on the same side, contended that the plaintiff should also have disclosed the previous voyage from Buenos Ayres to St. Thomas. Murdock v. Potts, Marsh. Ins. 230.

Mr. Key, contra. The ownership may be proved by circumstantial evidence, and we have a right to contend before the jury, that the plaintiff is the owner notwithstanding the register is in the name of Stewart. Both Simmes and Stewart had an insurable interest in the vessel. She was worth $4,000, and only $1,260 were due to Stewart. Simmes rigged her at his expense, and fitted her out. Stewart must be considered as a mere mortgagee. He had an interest in the vessel to the extent of his $1,260, and no further. All the earnings of the vessel belonged to Simmes. He had the whole use of the vessel. Stewart could not have claimed the freight from the consignees. The fact that a part of the cargo was taken in at Buenos Ayres, does not affect the plaintiff's right to freight from St. Thomas to Havana. The courts of one nation do not enforce the revenue laws of another nation.

THE COURT refused to give the instruc-